# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **TERAH MORRIS,** | ) | |
| Plaintiff | ) | Civil Action No.: 7:15cv00675 |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| **MRS. FLETCHER, et al.,** | ) | |
| Defendants | ) | |

The plaintiff, Terah Morris, ("Morris"), an inmate incarcerated at Red Onion State Prison, ("Red Onion"), in Pound, Virginia, and proceeding pro se, filed this civil rights action pursuant to 42 U.S.C. § 1983, alleging that the defendant prison officials, all of whom are employees of the Virginia Department of Corrections, ("VDOC"), or are contractual service providers at Red Onion, have been deliberately indifferent to serious medical needs, in violation of his Eighth Amendment rights, by failing to provide adequate medical treatment for gender identity disorder, ("GID"). In particular, the only claim remaining before the court is Morris's claim that the defendants, Dr. McDuffie, Dr. Smith, and V. Phipps, failed to provide him with hormone shots. *See* Order, Docket Item No. 198. This case is before the court on the Motion For Summary Judgment filed by Phipps, (Docket Item No. 230), the Motion For Summary Judgment filed by Dr. McDuffie, (Docket Item No. 232), the Motion For Summary Judgment filed by Morris, (Docket Item No. 239), and the Motion For Summary Judgment filed by Dr. Smith, (Docket Item No. 241), (collectively, "Motions"). None of the parties has requested a hearing on the Motions, making them ripe for disposition. The Motions are before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). The undersigned now submits the following report, recommending that Morris's Motions be denied, the defendants' Motions be granted, and

summary judgment be entered in the defendants' favor on Morris's remaining claim.

## I. Facts

As stated above, Morris's only claim remaining is the claim that the defendants, Dr. McDuffie, Dr. Smith, and V. Phipps, failed to provide him with hormone shots for treatment of GID. Morris seeks monetary, injunctive and declaratory relief. In the verified Complaint, Morris wrote, in part:

> … I finally seen Dr. McDuffie psychiatrist on 10-29-15 tried to explain to him what was going on and he yelled told me that he don't ever want to hear me discuss [GID] ever….
> … While speaking with Mental Health I was asking Medical for service and Dr. Smith refused said that they don't provide hormone shot or pills that I look like a male to him[. H]e also stated he was going to guarantee me 6 months of life[. H]e never tried to diagnose me or anything so I wrote Mrs. Phipps … she told me that I have normal male genitalia that there is no question she can answer which is a violation[] of my Eighth Amendment cruel and unusual punishment.

(Docket Item No. 1 at 2-4.)

In an Affidavit attached to his Complaint, Morris wrote:

> On or about January 2015, I started putting in … asking about … hormone shot[s] because that's about the time they put me in population[.] I was told several times that they do not provide it. …
> … I wrote Ms. Phipps the head nurse here and [she] told me I have normal male [genitalia] that right there tells me that she does not have any experience with GID because if she did she definitely would have not said that[.] Dr. Smith who is the institutional [doctor] says he's gonna give me 6 months guaranteed life every time I see him he

refuses to prescribe me stuff[.] Also I've been on suicide 3 [times] give or take[.] I just recently came off on the 25th of November 2015[.] They put me on because they intercepted a letter stating I was going to kill myself, etc.

(Docket Item No. 1-3 at 1-2.)

Defendant Phipps has provided an Affidavit, (Docket Item No. 231-1) ("Phipps's Affidavit"), in support of her motion. Phipps's Affidavit stated, in part:

> … As a registered nurse, I make no direct decisions regarding an offender's medical needs or appropriate course of treatment. I relied on the professional judgment of the institutional physicians and did not substitute my own judgment for their professional opinions concerning an offender's condition or treatment. In order for nursing staff at [Red Onion] to issue or administer any type of medical vaccination to an offender, there must be a written order from the institutional physician. Without the order or medical authorization in place, I cannot administer any type of medical vaccination to an offender. I do not have the authorization to do so. I reviewed Morris'[s] medical records and determined there was no order for hormone shots for Morris. If such an order existed, I would have provided the hormone shots. …

(Phipps's Affidavit at 1-2.)

Defendant Dr. McDuffie has provided a Declaration, (Docket Item No. 233-4) ("Dr. McDuffie's Affidavit"), in support of his motion. According to Dr. McDuffie's Affidavit, Morris, at an October 29, 2015, appointment "abruptly reported her self-diagnosis of GID." (Dr. McDuffie's Affidavit at 2.) Dr. McDuffie stated that he determined that Morris had no history of treatment for GID, no records supporting symptoms of GID, failed to present with GID symptoms and did not demonstrate or express any risk of harm due to GID. (Dr. McDuffie's

Affidavit at 2.) He said that, during the appointment, Morris fixated on administrative complaints with the VDOC rather than focusing on psychiatric care and treatment. (Dr. McDuffie's Affidavit at 2.)

Dr. McDuffie's Affidavit continued, in part:

> …As the undisputed record provides, prior to her self-diagnosis of GID, Plaintiff did not once attempt to harm herself or report that she was intending on harming herself due to GID characteristics. Plaintiff did not demonstrate any GID symptoms prior to her self-diagnosis of GID. However, Plaintiff continuously and frequently demonstrated manipulative behavior for personal gain.
> … Based on my experience as a psychiatrist and my knowledge of Plaintiff's frequent manipulative tendencies for personal gain and continued noncompliance with her medical care, I opined that Plaintiff was malingering GID, continued Plaintiff's current medications and ended the session.
> … I concluded that Plaintiff's vague statements about GID were inadequate for a diagnosis the day of Plaintiff's first mention of GID, and I certainly did not assume Plaintiff was at risk of harm.
> … Although I did raise my voice and end the session, I did not advise that Plaintiff should never bring up GID again, and in fact, I scheduled a follow-up with Plaintiff.
> … After the October 29, 2015[,] appointment, I continued to treat Plaintiff on numerous occasions and continued to assess her alleged GID based on her evolving symptoms. …

(Dr. McDuffie's Affidavit at 2-3.) Dr. McDuffie stated that GID affects people differently and treatment for GID is based on the individual. (Dr. McDuffie's Affidavit at 3.) He stated that appropriate treatment for GID must be determined individually and that working with a psychologist or psychiatrist should be part of every treatment for GID. (Dr. McDuffie's Affidavit at 3.) Dr. McDuffie stated that he had provided appropriate treatment to Morris based on the symptoms presented. (Dr. McDuffie's Affidavit at 4.) He further stated, "At no time was I deliberately

indifferent to Plaintiff's medical needs, nor did I fail to provide care that I knew Plaintiff needed." (Dr. McDuffie's Affidavit at 4.)

Attached to Dr. McDuffie's Affidavit are a number of medical records, which he stated were true and accurate copies from Morris's Red Onion medical records. (Docket Item No. 233-1.) These medical records show that, on September 4, 2014, Morris reported hearing voices daily and that his psychiatric medication was not helping this symptom. (Docket Item No. 233-1 at 3.) Dr. McDuffie diagnosed Morris with stable chronic psychosis, as well as schizophrenia, rule out schizoaffective disorder. (Docket Item No. 233-1 at 3.)

These records also show that, at some point while being held in the VDOC, Morris had been designated both as a High Risk Sexual Aggressor and a High Risk Sexual Victim. (Docket Item No. 233-1 at 4.) On September 11, 2014, Red Onion Qualified Mental Health Professional, ("QMHP"), Terrance Huff, M.Ed., noted that Morris was advised of these designations. (Docket Item No. 233-1 at 4.) He noted that Morris stated, "he felt he could be potentially victimized and may be aggressive towards another offender due to his bi-sexual tendencies. He stated he was 'married' to another offender at his previous institution." (Docket Item No. 233-1 at 5.) An October 15, 2014, Mental Health Services Progress Note reflected that Morris was seen by QMHP K. Wright, M.S., on monthly mental health rounds. (Docket Item No. 233-1 at 6.) Wright noted that Morris was calm and cooperative with euthymic mood, full affect, linear and logical thought process, no abnormal thought content, no reported perceptual disturbances, alert and oriented with no suicidal or homicidal ideations, adequate insight, good judgment and good impulse control. (Docket Item No. 233-1 at 6.) Morris requested a change in his psychiatric medication. (Docket Item No. 233-1 at 6.) On November 14, 2014, Dr. McDuffie noted that Morris was discharged from psychiatry because Morris was refusing

psychiatric medications. (Docket Item No. 233-1 at 7.) On November 24, 2104, Morris requested to be placed back on psychiatric medications "because he feels he does need them." (Docket Item No. 233-1 at 8.)

The records show that Dr. McDuffie saw Morris again on January 7-8, 2015, because Morris wanted to resume psychiatric medication. (Docket Item No. 233-1 at 9.) Morris reported no suicidal or homicidal ideations, but an anxious mood. (Docket Item No. 233-1 at 9.) Dr. McDuffie diagnosed Morris with schizoaffective disorder and prescribed monthly prolixin decanoate injections. (Docket Item No. 233-1 at 9.) On February 19, 2015, Morris complained of hallucinations, nightmares and flashbacks to Huff. (Docket Item No. 233-1 at 10.) Huff noted that Morris's reported symptoms were not observable, did not appear to be in any distress, and he denied suicidal ideations. (Docket Item No. 233-1 at 10.)

On February 25, 2015, Morris told QMHP C. Adams, M.Ed., that Morris was going on a hunger strike until moved back to a cell with his cellmate. (Docket Item No. 233-1 at 11.) Adams noted, "Offender voiced that he is having flashbacks from when he was a child and was abused and stated that he can't be alone. 'Security said that I tried to fuck on my cellie and then they put me in a room and started hitting on me and slapping me around and all.'" (Docket Item No. 233-1 at 11.) Adams stated that Morris would not agree against self-harm and stated, "'By tomorrow if I don't get what I want then I've got to do what I got to do.'" (Docket Item No. 233-1 at 11.) Adams noted that Morris's mood was irritable, with a full and restricted affect, but no abnormal thought content. (Docket Item No. 233-1 at 11.) Adams stated that Morris appeared tangential and manipulative during the assessment, and recommended that Morris be moved to a safety cell with metal/razor restrictions. (Docket Item No. 233-1 at 11.)

On March 9, 2015, Morris reported an increase in audiovisual hallucinations and stress after being placed in restrictive housing. (Docket Item No. 233-1 at 12.) Morris also complained of audio hallucinations telling him to hurt himself. (Docket Item No. 233-1 at 12.) QMHP Huff noted, "It is likely Offender Morris (who stated he wasn't trying to manipulate me) was attempting to manipulate staff in order to be returned to [general population] sooner. His mood and affect were within normal limits, contrary to his statements; however, razor restrictions are warranted due to his veiled statements of self-harm." (Docket Item No. 233-1 at 12.)

On March 13, 2015, Dr. McDuffie saw Morris and noted a history of homosexuality, difficulty taking medication and psychosis. (Docket Item No. 233-1 at 13.) Morris specifically requested to receive depakote or liquid medication and continued to complain of auditory and visual perceptual disturbances. (Docket Item No. 233-1 at 13.) Dr. McDuffie diagnosed psychosis, not otherwise specified, and a personality disorder. (Docket Item No. 233-1 at 13.) He also noted, "possible he is feigning illness for a reason unknown at this time." (Docket Item No. 233-1 at 13.) Dr. McDuffie saw Morris in follow-up on June 4, 2015. (Docket Item No. 233-1 at 14.) On this occasion, Morris denied any perceptual disturbances. (Docket Item No. 233-1 at 14.) Dr. McDuffie diagnosed schizoaffective disorder and personality disorder, not otherwise specified. (Docket Item No. 233-1 at 14.)

QMHP S. Fletcher, M.Ed., saw Morris on Morris's request on June 9, 2015. (Docket Item No. 233-1 at 15.) Fletcher noted:

> Offender reported that he would like to go back on his medication. He states that being in a single cell is causing him distress. He reports that while he has had several cell mates he feels he is being discriminated against due to his sexuality. He reports feeling

> out of place, and not fitting in in B1 pod. He reports hearing voices
> that are cussing him, and calling him names. … He denies any
> thoughts of self-harm or suicide.

(Docket Item No. 233-1 at 15.) Fletcher stated that Morris was cooperative and appeared physically healthy with no visible signs of injury or signs of psychosis. (Docket Item No. 233-1 at 15.)

Dr. McDuffie saw Morris again on July 10, 2015, and he noted that Morris complained of suicidal thoughts. (Docket Item No. 233-1 at 16.) Dr. McDuffie noted that Morris told him that "he will become suicidal again if he does not get what he wants; he wants a cell partner because he says he hears voices when he is lonely." (Docket Item No. 233-1 at 16.) Dr. McDuffie diagnosed Morris with a personality disorder, moderate suicide risk and history of psychosis. (Docket Item No. 233-1 at 16.) He stated that Morris was "manipulative." (Docket Item No. 233-1 at 16.) Dr. McDuffie saw Morris in follow-up on July 16, 2015, and noted a history of psychosis and suicidality. (Docket Item No. 233-1 at 17.) He noted that Morris requested psychiatric medicines in injection or liquid form. (Docket Item No. 233-1 at 17.) Dr. McDuffie diagnosed psychosis and borderline personality disorder and ordered Risperdal injections for Morris. (Docket Item No. 233-1 at 17.) On August 14, 2015, Dr. McDuffie noted that Morris was not depressed, but still had episodic mood lability and seemed to be progressing in the then-current housing situation. (Docket Item No. 233-1 at 18.)

QMHP Fletcher saw Morris on November 23, 2015, due to a letter in which Morris wrote, "I'm really on the verge of suicide." (Docket Item No. 233-1 at 26.) Fletcher noted, "Offender admitted to writing the letter…. He reports that he did not intend for mental health to see it. He stated he was writing to get help from outside the institution with his wanting to become a woman." (Docket Item No.

233-1 at 26.) Fletcher noted that Morris denied any suicidal or homicidal ideations or thoughts of self-harm. (Docket Item No. 233-1 at 26.) Fletcher noted that Morris appeared agitated, and Fletcher placed Morris on 15-minute watch with metal/razor/rigid/spork/pen restriction. (Docket Item No. 233-1 at 26.) QMHP J. Sykes, M.Ed., evaluated Morris on November 25, 2015, and Morris continued to deny any thoughts of suicide or self-harm. (Docket Item No. 233-1 at 27.) QMHP Adams released Morris from suicide precautions on November 30, 2015. (Docket Item No. 233-1 at 28.) Adams also noted that Morris stated, "I don't want to see the Psychiatrist anymore because the last time he yelled at me and kicked me out of the office." (Docket Item No. 233-1 at 28.) Adams noted that Morris also stated, "I do want more office visits." (Docket Item No. 233-1 at 28.)

A December 21, 2015, medical note by S. Stallard, a licensed practical nurse, states that Dr. McDuffie would be notified that Morris was caught trying to pass six Wellbutrin ER pills to another inmate. (Docket Item No. 233-1 at 30.) The nurse noted that Morris was prescribed this medication daily. (Docket Item No. 233-1 at 30.) The record also contains notes that mental health workers met with Morris on January 21 and 27, 2016, for assessments based on Morris being placed on precautions. (Docket Item No. 233-1 at 37-38.) Neither report stated that Morris was experiencing any suicidal or homicidal ideations. (Docket Item No. 233-1 at 37-38.)

A Mental Health Services Progress Note of an April 1, 2016, encounter between QMHP D. Trent, BSN, M.Ed., and Morris also is attached as an exhibit to Dr. McDuffie's Affidavit. (Docket Item No. 233-1 at 44-45.) On this Note, Trent wrote:

When contact was made by the QMHP[,] the offender stated "when am I going to see you in an office again?" The QMHP [informed] Mr. Morris that the appropriate treatment for him has been determined to meet with him every 30 days and [as needed]. Mr. Morris became frustrated and said, "why"?. The QMHP explained how the QMHP had met with him in an office setting and that he had written a letter to Richmond that made several false accusations on it. The QMHP further explain[e]d that in order for the clinician to meet with him in an office setting a [witness] must be present and a release of information must be signed. The offender approved of this approach. He next became angry stating [that] none of the mental health professionals he has come into contact with "knows how to do their fucking jobs". He added "doesn't your stupid fucking boss realize that I'm suing his ass? At this time you aren't being sued (talking to the QMHP), but if you keep fucking me around I'm gonna sue your ass too bitch." At this time the QMHP ended the contact and walked away. The offender was still screaming and cursing.

(Docket Item No. 233-1 at 44.)

Trent saw Morris again on April 8, 2016, and noted:

Mr. Morris asked "why haven't you pulled me to your office[?"] The QMHP informed Mr. Morris that he was recently seen in an office setting and he has several other offenders before him. Mr. Morris then stated "you are going to see me every day aren't you"? The QMHP informed the offender that the recommended support for his case is for him to be seen 1 time every month. Mr. Morris informed the clinician that he is suing several of the mental health clinician's and if QMHP didn't do what he asks he will be suing the QMHP as well. He also added "my situation is a very delicate one and is a severe medical issue."

(Docket Item No. 233-1 at 46.) Trent noted that he responded to Morris's cell door on April 15, 2016, after Morris called out to him while he was making rounds. Trent noted:

> Offender stated "have you heard any news on what I'm trying
> to accomplish"? The QMHP reminded the offender that his current
> treatment regimen is what has been agreed upon by the mental health
> department. Mr. Morris next asked if he can be seen in an office
> setting. He held up a book and displayed it to the QMHP and stated
> "This book is about being transgender and I have a whole bunch of
> symptoms I need to share with you regarding what I have read in this
> book."

(Docket Item No. 233-1 at 48.)

QMHP Trent noted that he visited Morris again at Morris's cell door on May
11, 2016. Trent's note of this encounter stated:

> Offender was noted to be screaming loudly and banging on his
> cell door for the QMHP. He sounded to be in distress, so the QMHP
> made contact to ensure his safety. …
> Upon arrival to his cell door Mr. Morris stated "you are going
> to pull me to your office right now." The QMHP asked if he was
> having an emergency in which he stated "you are my psychologist and
> I am telling you that you have to see me". The QMHP explained that
> he is scheduled to see the QMHP 1 time per month in office setting
> and that he was last seen on 4/25/2016. The QMHP also added that he
> is not on the list of offenders that need to be seen in office today. The
> QMHP also explained that those offenders scheduled for the day are
> not being pulled due to the QMHP being told that they do not have the
> available staff to pull offenders. Mr. Morris replied by saying "Listen,
> you and I need to get on the same page …. [Y]ou are here as my
> psychologist and what you fail to understand is I am not like all of
> these other [offenders] in here and once you get on the same page as
> me you will realize this.  Furthermore, if you don't do what I say I am
> going to bang and scream all day to drive you crazy. … I will also be
> going on a hunger strike as well."  The QMHP requested that he share
> what his emergency is and he replied "I need to talk about my gender
> issue". The QMHP informed him that best that can be done is for the
> QMHP to listen at his cell door. He then replied we can't do that
> because of my confidentiality. The QMHP then informed Mr. Morris
> that he will be seen at his next regularly scheduled visit. As the

> QMHP left his cell door Mr. Morris began yelling and cursing at the
> QMHP saying "you need to do your fucking job bitch."

(Docket Item No. 233-1 at 51.) Trent noted that Morris's behavior was agitated,
and his speech was rapid and pressured. (Docket Item No. 233-1 at 51.) Trent also
noted:

> Mr. Morris was observed standing at his cell door during the
> interaction. He was noted to be using pressured speech and pointing
> his finger at the QMHP in an aggressive manner. He was noted to be
> screaming at various times during the interaction. The clinician's use
> of a calm low pitched voice appeared to have the opposite of a
> calming effect. Mr. Morris's thoughts appeared organized and
> complete. The QMHP did not observe any safety issues at that time.
> All of Mr. Morris's actions appeared to be motivated by an attempt to
> come out of his cell. The QMHP, if having the ability to pull Mr.
> Morris would not have done so due to the aggressive posturing that he
> was engaged in. This, plus the fact that he did not appear to be a threat
> to himself, was enough for the clinician to decide that terminating the
> conversation was the most appropriate course of action at the time.

(Docket Item No. 233-1 at 52.) Under the "Plan" section of his report, Trent noted:
"…Do not allow Mr. Morris's attempts at manipulating any success as it will only
reinforce this mal-adaptive behavior." (Docket Item No. 233-1 at 52.)

On June 24, 2016, Dr. McDuffie noted that he saw Morris for complaints of
anxiety. (Docket Item No. 233-1 at 53.) Dr. McDuffie noted that Morris said "he
has had increased worry and restlessness with his housing and status and not seeing
administrative outcomes resulting in his favor." (Docket Item No. 233-1 at 53.) Dr.
McDuffie also noted that he had agreed to participate in Morris's reassessment for
GID. (Docket Item No. 233-1 at 53.) Dr. McDuffie also wrote: "He is one of a
population of incarcerated individuals claiming to have gender identity dysphoria
without matching to the etiology and natural history that would typically be seen

among GID individuals in the community which is distinctly different from determining he may be feigning the condition." (Docket Item No. 233-1 at 53.)

Also attached as an exhibit to Dr. McDuffie's Affidavit is a string of emails containing an December 9, 2016, email that purports to be from Dr. McDuffie to Dr. Meredith R. Cary, M.D., VDOC Chief Psychiatrist. (Docket Item No. 233-1 at 55-56.) This email from Dr. McDuffie states: "I have diagnosed [Morris] with unspecified gender identity [disorder] without eliminating the possibility of malingering from 8-11-16. I have no plan to offer him any feminizing therapies unless they are initiated by clinicians who spend more time with gender dysphoric patients than we do." (Docket Item No. 233-1 at 55-56.)

Also attached as an exhibit to Dr. McDuffie's Affidavit is a Health Services Complaint and Treatment Form, dated December 9, 2016, on which Dr. McDuffie wrote:

It is my opinion that this offender should be evaluated by a consultant with some expertise in gender identity disorders.  I am uncertain about matching recommendations to this offender about his condition for several reasons:
  1)    the offender does not always offer truthful portrayals of reality in recalling his own experiences[;]
  2)    the offender is actively pursuing litigation against the undersigned[; and]
  3)    the offender would be best served by seeing a consultant whom treats gender identity problems more frequently than the undersigned.

(Docket Item No. 233-1 at 58.) Another note from Dr. McDuffie, dated January 20, 2017, stated: "It is my opinion that this offender should be referred to an expert in

diagnosing and managing individuals with gender identity dysphoria." (Docket Item No. 233-1 at 61.)

Defendant Dr. Smith also has provided an Affidavit, (Docket Item No. 242-1) ("Dr. Smith's Affidavit"), in support of his motion. In Dr. Smith's Affidavit he stated that he is a physician who did work in Red Onion's Medical Department and who provided medical treatment to Morris. (Dr. Smith's Affidavit at 2-3.) Dr. Smith stated that mental health care and services at Red Onion were provided by Red Onion's Mental Health staff. (Dr. Smith's Affidavit at 2.) As a physician, Dr. Smith stated, he was not a member of Red Onion's Mental Health staff. (Dr. Smith's Affidavit at 2.) Dr. Smith's Affidavit, continued, in part:

> … As a physician …, I would defer to the facility's Mental Health staff for assessments, recommendations and treatments of mental health conditions and/or mental health requests, including evaluation/diagnosis of gender dysphoria and any specialized decisions, accommodations or treatment for gender dysphoria.
> … Hormone shots or pills are considered specialized accommodations for offenders diagnosed by the Mental Health staff with gender dysphoria.

(Dr. Smith's Affidavit at 2.)

Dr. Smith's Affidavit stated that, on August 23, 2015, Morris requested to be seen by the Medical Department for complaints of a rash and to get "back on my hormone shot." (Dr. Smith's Affidavit at 2.) Dr. Smith stated that Morris was assessed by Nurse S. Mullins, L.P.N., on August 26, 2015. (Dr. Smith's Affidavit at 2.) In her note, Mullins wrote that Morris wanted the hormone shots that he took at the last prison. (Dr. Smith's Affidavit at 2.) Dr. Smith stated that he evaluated Morris on September 1, 2015, in light of the request for hormone shots. (Dr.

Smith's Affidavit at 3.) He said that Mullins documented the visit and noted that there was no documentation showing that Morris had received hormone shots in the past. (Dr. Smith's Affidavit at 3.) Dr. Smith stated, "I found that Plaintiff was stable at the time and requested that he continue to be monitored." (Dr. Smith's Affidavit at 3.)

Dr. Smith's Affidavit also stated that he had reviewed Morris's VDOC medical record, including Mental Health records. (Dr. Smith's Affidavit at 1.) While Dr. Smith said that a true and accurate copy of these records were attached to his Affidavit, the court notes that some of these records have been redacted. (Dr. Smith's Affidavit at 1.)

According to Dr. Smith, Morris was assessed by QMHP J. Sykes, on October 1, 2015. (Dr. Smith's Affidavit at 3.) He said that Sykes wrote the following on the note of this assessment:

> Offender … stated "oh yeah I know what I wanted to talk to you about, you remember when there was a QMHP Wright? Her and QMHP Huff came and asked me if I ever took hormone medications. I wanted to tell you I did when I was real little, like 15-16." This offender then went on to discuss how he had been reading about lawsuits regarding transgender offenders. This offender stated that he did not have any difficulties and had been off hormones before entering DOC and had no current concerns and no reactions since being off the medication, but want to learn what some difficulties/reactions could be, should some arise in the future.

(Dr. Smith's Affidavit at 3.)

A portion of the Mental Health Services Progress Note of Sykes's interaction with Morris on October 1, 2015, is attached as an exhibit to Dr.

McDuffie's Affidavit. (Docket Item No. 233-1 at 22.)  In addition to the above, the note stated, "This offender noted that his only stressors at this time were that he didn't have batteries, couldn't talk to his family and his cellmate." (Docket Item No. 233-1 at 22.) Morris complained that his cellmate was "dirty." (Docket Item No. 233-1 at 22.)

Dr. Smith's Affidavit stated that Morris was assessed by QMHP Fletcher on November 5, 2015, who noted that Morris reported that he was struggling with his sexuality and did not know what he wanted at that point. (Docket Item No. 242-1 at 21.) Dr. Smith's Affidavit stated that Fletcher spoke to Morris again on November 12, 2015, and noted:

> … [W]e discussed his wanting to pursue his request to receive a hormone shot. We discussed the documentation that was needed in order to proceed.  We brainstormed on ways he could get the needed information. He denied SI/HI [suicidal ideations/homicidal ideations] or thoughts of self-harm.
> …
> Assessment: Offender appeared to be stable and does not present any mental health symptoms other than those he is self-reporting.
> Plan: … QMHP will continue to work with the offender as he provides necessary documentation to process his request. Monitor per [Mental Health] policy.

(Docket Item No. 242-1 at 22.) The Mental Health Services Progress Note from this encounter is attached as an exhibit to Dr. McDuffie's Affidavit. (Docket Item No. 233-1 at 25.)

Dr. Smith's Affidavit further stated:

On January 8, 2016, Plaintiff received a thorough psychological evaluation in response to Plaintiff's request to receive hormone treatments because he believed that he suffered from gender dysphoria for which he requested a combination of hormone therapy, psychological counseling, and to be allowed to live in his preferred gender role…. The psychological evaluation was undertaken to explore Plaintiff's claim that he was transgendered, to assess for gender dysphoria and to provide recommendations for treatment. In the background information section of the psychological evaluation, it was noted that Plaintiff had an extensive history of abuse and psychiatric diagnoses. During the clinical interview that accompanied Plaintiff's psychological evaluation, Plaintiff's sexual history was reviewed, and Plaintiff reported that in the past he had self-medicated with prescription hormone pills that belonged to a friend as well as a couple of hormone shots. Notably, Mr. Morris stated that he had never been treated with hormones by a physician as opposed to Plaintiff's earlier reports that he had been treated at a medical facility whose name and location he could not recall. In the conclusion section of the psychological report, it was found that all elements of gender dysphoria diagnostic criteria … were endorsed by Mr. Morris, but attempts to gather clarification and collaborating information were incomplete and inconsistent because Mr. Morris was unable to provide other means to confirm the information he provided. Given the contraindications of Mr. Morris'[s] previous claims of having been provided treatment and his activities while incarcerated, the results were inconclusive at the time of the evaluation regarding a possible diagnosis of gender dysphoria.

(Dr. Smith's Affidavit at 5-6.) According to the report of this assessment, Morris was diagnosed with schizoaffective disorder. (Docket Item No. 242-1 at 26.)

A copy of the report of this assessment is attached as an exhibit to Dr. McDuffie's Affidavit. (Docket Item No. 233-1 at 31-34.) It is noted in this report that Morris provided a history of being sexually abused and that Morris had a history of assaulting and sexually assaulting others. (Docket Item No. 233-1 at 31.) The evaluators noted that, based on the records they reviewed, Morris had previous diagnoses of post-traumatic stress disorder, bipolar disorder with manic episodes

and psychotic features, mood disorder, conduct disorder and attention deficit hyperactivity disorder. (Docket Item No. 233-1 at 32.) Huff noted that, during his interview with Morris, Morris "gave no preferred gender pronoun." (Docket Item No. 233-1 at 32.) Huff noted that Morris "was forthright and very detailed explaining his past and current alleged transgender status." (Docket Item No. 233-1 at 32.)

This report stated:

> Mr. Morris reports that he has been very guarded sharing his sexual preferences with others because he does not trust people. … He reported that he never really discussed his gender with past therapists because he did not trust them. He reports that he has had "thoughts of cutting off my sex organs in the past 4 or 5 months." He stated that immediately prior to incarceration he was prostituting himself, and that he was dressing as a woman to entice males into paying for sex with him. … He reports that his sexual preference is men and that his long term goal is to become "Caitlyn Jenner" and go to culinary art school to become a "chef."

(Docket Item No. 233-1 at 32-33.) The report also stated:

> Mr. Morris was assessed per his report that he is suffering from Gender Dysphoria and his request for hormone therapy. All facets of Mr. Morris'[s] mental status were within normal limits. During the interview, Mr. Morris was very cooperative and responsive. …
> According to the Diagnostic and Statistical Manual of Mental Disorder[s] Fifth Edition (DSM-5), "*Gender dysphoria* refers to the distress that may accompany the incongruence between one's experienced or expressed gender and one's assigned gender." The following are DSM-5 Gender Dysphoria diagnostic criteria compared with Mr. [Morris's] responses:
> **1. A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics.** Response: Mr. Morris reported feeling like he

wanted to be female since age 10. There is no documented evidence available to assist in verifying this statement.

**2.     A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender.** Response: Mr. Morris reported that he had been having thoughts of "cutting his male organs off in the last 4 or 5 months". Mr. Morris'[s] statement is the only information we have regarding this intention. There have been no incidents of self-harm or self-mutilation concerning Mr. Morris reported. Mr. Morris reports that he "masturbates all the time," and that his charge for indecent exposure occurred when he was masturbating when a female [correctional officer] was making security checks.

**3.     A strong desire for the primary and/or secondary sex characteristics of the other gender.** Response: Mr. Morris stated that he would "like to become Caitlyn Jenner and live as a female on the street." He reported that he does enjoy masturbation but could live without it and use toys to pleasure himself. … No other indications of a strong desire for the primary and/or secondary sex characteristics of the other gender were evidenced.

**4.     A strong desire to be of the other gender.** Response: Mr. Morris reported that he has felt this way since age 10. However, he has no family to collaborate this as he was raised in foster care and he says he was very guarded about letting people know of his sexual preferences.

**5.     A strong desire to be treated as the other gender.** Response: Mr. Morris stated that he has related to the female gender since the age of 10. But, he also reported experimenting with his sexuality for a number of years, including having sexual intercourse with females. Mr. Morris stated he would "like to become Caitlyn Jenner when he is released to the street." No further in-depth information regarding his desire was offered.

**6.     A strong conviction that one has the typical feelings and reactions of the other gender.** Response: Mr. Morris reported that he believed he acts more like a female because he get[s] more emotional over situations than men do. He also reports the desire to wear women's clothing. There have been no reports from any staff at [Red Onion] of Mr. Morris attempting to feminize his clothing or to wear "make-up." He reported that he does enjoy masturbation but could live without it. … In contrast to these statements, he self-reports that he "masturbates all the time" and has received two charges for

sexual misconduct, both toward females. He was found guilty of a
charge received for indecent exposure when he masturbated toward a
female officer on 4/14/15. Mr. Morris was found guilty for a charge of
Sexual Assault on a non-offender (a female officer) on 8/7/14 after he
"slapped" her "on the buttocks in a very aggressive manner."

(Docket Item No. 233-1 at 33-34) (emphasis in original).

Dr. Smith's Affidavit also stated that Morris was evaluated by Dr. McDuffie
on January 28, 2016, who noted that Morris had decided that Morris's emotional
liability and distress was from gender identity dysphoria for which treatment was
needed rather than treatment with mood and antipsychotic medications. (Dr.
Smith's Affidavit at 6.) According to his Psychiatric Progress Note of this date, Dr.
McDuffie stated that Morris alleged gender identity dysphoria, but had no
confirmed diagnosis, and Dr. McDuffie would defer to a consultant to assess.
(Docket Item No. 242-1 at 29.) Dr. McDuffie noted that Morris was not requesting
any psychiatric medication "because he believes his problems are explained by
GID and not another psychiatric condition." (Docket Item No. 242-1 at 29.) A
copy of this report is attached to Dr. McDuffie's Affidavit. (Docket Item No. 233-1
at 39.)

Dr. Smith's Affidavit also stated that QMHP Trent saw Morris on March 3,
2016, for a scheduled mental health visit. (Dr. Smith's Affidavit at 6.) To the
contrary, Trent's Mental Health Services Progress Note from this date stated that
he spoke to Morris after he received notification that Morris was requesting to
speak to a QMHP. (Docket Item No. 242-1 at 30.)  Regardless, Trent noted:

The offender began discussing and explaining why he should be
[diagnosed] with Gender Dysphoria. Mr. Morris began explaining
policy and stated that it is "against the law" to withhold this

> [diagnosis], as well as not providing him the "proper treatment for Gender Dysphoria." Mr. Morris also stated that he had been given an assessment and that he "demands to know the results." He instructed the QMHP to ask the QMHP's supervisor of the results and added, "I have written request after request regarding this and all of my requests are [] being ignored."

(Docket Item No. 242-1 at 30.) Trent noted that he spoke to Morris again on April 8, 2016, and Morris told Trent that "he had been on hormone replacement therapy illegally on the street. He stated that he was getting them from his sister." (Docket Item No. 242-1 at 33.)

Dr. McDuffie evaluated Morris again on April 21, 2016, and wrote:

> Offender describes self as having gender identity dysphoria; no diagnosis was assigned today. Offender has [history] of schizoaffective [disorder] but now … believe[s] all emotional turmoil emerges from untreated gender identity issue.

(Docket Item No. 242-1 at 35.)

According to Dr. Smith's Affidavit, Trent saw Morris on April 25, 2016, for a scheduled monthly mental health visit, during which time Morris voiced frustration regarding the request to obtain a gender dysphoria diagnosis. (Dr. Smith's Affidavit at 7.) Trent noted that Morris said, "'[Y]ou all are not doing your jobs … you are neglecting my needs by not offering the correct treatment … by law you are supposed to be addressing my major diagnosis.'" (Docket Item No. 242-1 at 36.) Trent also noted that he informed Morris "that he is receiving the [treatment] suggested by the clinical supervisors. Mr. Morris was informed that he is receiving the [treatment] that was suggested by the mental health leadership DOC." (Docket Item No. 242-1 at 36.)

Dr. Smith's Affidavit also stated:

> I have never acted with deliberate indifference to Plaintiff's serious medical needs with respect to Plaintiff not being provided hormone shots or pills at [Red Onion] because as Plaintiff's records reflect, there was no documentation showing or proving that Plaintiff had received hormone shots or pills in the past. … I never acted with deliberate indifference to Plaintiff's serious medical needs by not providing him with hormone therapy because as the records reflect, there was no confirmed diagnosis of gender dysphoria, not history of physician prescribed hormone treatment for Plaintiff in any of his records, and Plaintiff even admitted that he received hormone replacement therapy on the streets illegally.

(Dr. Smith's Affidavit at 7-8.)

Morris also has filed a number of affidavits. In one of these affidavits, (Docket Item No. 239-2), Morris stated that Dr. McDuffie gave a diagnosis of GID on August 11, 2016. (Docket Item No. 239-2 at 2.) Morris also filed a copy of Dr. McDuffie's August 11, 2016, Psychiatry Progress Note, which states:

> … [M]ore forthcoming and less deceptive about gender identity [history]; excluded conditions include dissociative/identity, transvestic fetishism, homoerotic motivated sex reassignment, not psychotic, [history] emerging, closer to natural history of GID.

(Docket Item No. 239-4 at 1.) Under the Assessment section of the Note, Dr. McDuffie listed the following:

> F64.9 Gender identity status incongruent or Gender identity incongruence as "other" Gender identity [disorder] F64.8

(Docket Item No. 239-4 at 1.) "F64.9" appears to be a reference to the International Classification of Diseases and Related Health Problems, Tenth Revision, ("ICD-10"), code for Gender Identity Disorder, not otherwise specified. *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 838 (American Psychiatric Association 1994). Under the Plan section of the Note, Dr. McDuffie wrote:

> No medications prescribed, wants SRS [sex reassignment surgery] eventually, wants HRT [hormone replacement therapy], understands HRT and SRS will unlikely be offered by DOC.

(Docket Item No. 239-4 at 1.)

Morris also filed a copy of Dr. McDuffie's May 18, 2017, Psychiatry Progress Report. (Docket Item No. 239-4 at 2.) On this Note, Dr. McDuffie wrote under the Plan section: "Offender is self reporting as transgendered and is not considered by prescriber as a pathological condition to be treated." (Docket Item No. 239-4 at 2.)

In another of his affidavits, Morris stated:

> … On August 26, 2015 at approximately 7:40 AM Terah was seen on nursing sick call trying to receive hormonial [sic] treatment and was referred to see Dr. Smith on September 1, 2015 after being told Red Onion doesn't provide them. …

> … On August 30, 2015 Terah put in [an] Informal Complaint regarding being denied [hormone] treatment and on September 3, 2015 Ms. Vicky Phipps responded and stated you have normal male genitalia there is no question that I can answer here your question regarding hormone shots and breast implants were previously answered. …

> … On September 1, 2015 I was seen by Dr. Smith trying to receive hormonial [sic] treatment but was denied due to not having any documentation….

(Docket Item No. 239-6 at 1.) Morris also filed a copy of the August 30, 2015, Informal Complaint, containing Phipps's response. (Docket Item No. 239-7 at 2.)

In another affidavit, Morris stated:

> … On August 23, 2015 Terah placed a sick call request in to receive hormone shots. …
> … On August 26, 2015 Terah was seen on general sick call in regards to receiving hormone shorts and was scheduled to see Dr. Smith on 9-01-15. …
> … On September 1, 2015 Terah was seen by Dr. Smith in regards to receiving hormone shots but was denied due to not having any documentation. …
> …
> … The Operating Procedure 038.3 does not state specialized decisions to provide specific individual accommodations to transgender or intersex offenders and offenders diagnosed by mental health staff with gender dysphoria shall be made by the gender dysphoria committee.

(Docket Item No. 246-1 at 1-2.)

Morris has filed a copy of his August 23, 2015, Offender Request form, on which he checked boxes for an appointment request with Medical. (Docket Item No. 246-4 at 1.) He wrote, "I would like to be seen for rashes and getting back on my hormone shot." (Docket Item No. 246-4 at 1.) By response dated August 25, 2015, Morris was notified "Scheduled for Sick Call." (Docket Item No. 246-4 at 1.) Morris also has filed a copy of a Nursing Evaluation Tool General Sick Call form, dated August 26, 2015, and signed by S. Mullins, LPN. (Docket Item No.

246-4 at 2.) On this form, Mullins wrote "wants hormone shots took at last prison."
(Docket Item No. 246-4 at 2.) Mullins noted that she referred Morris to be seen by
Dr. Smith on September 1, 2015.  (Docket Item No. 246-4 at 2.)

Morris also filed a copy of a Health Services Complaint and Treatment
Form, for his September 1, 2015, appointment with Dr. Smith. (Docket Item No.
246-2 at 2.) The handwriting on the form appears to state that Morris was seen
requesting hormone shots. (Docket Item No. 246-2 at 2.) Morris told Dr. Smith, "I
was getting [the shots] on the street" before incarceration. (Docket Item No. 246-2
at 2.) Dr. Smith noted, "No documentation in chart." (Docket Item No. 246-2 at 2.)
He wrote that Morris was stable, they "discussed shots" and, "No shots." (Docket
Item No. 246-2 at 2.) Under his plan, Dr. Smith wrote "Monitor." (Docket Item
No. 246-2 at 2.)

Morris also has filed a copy of a Psychiatry Progress Note, dated October
29, 2015, and signed by Dr. McDuffie. (Docket Item No. 251-1 at 1.)  On this
Note, Dr. McDuffie wrote:

> [T]his is a male offender whom has abruptly decided he only
> wants treatment for gender dysphoria; this man has no history of
> treatment or surgery for gender identity problems and has no
> supporting records of treatment for gender dysphoria.

(Docket Item No. 251-1 at 1.) Dr. McDuffie noted that Morris had a history of
"malingering a medical condition." (Docket Item No. 251-1 at 1.) Dr. McDuffie
also wrote:

> [History] of schizoaffective diagnosis feigning a gender identity
> problem, still treated for schizoaffective and his meds will continue;
> session ended abruptly; 90 day review.

(Docket Item No. 251-1 at 1.) Dr. McDuffie prescribed Risperdal injections and Wellbutrin XL for Morris on this date. (Docket Item No. 251-1 at 1.)

## II. Analysis

With regard to a motion for summary judgment, the standard for review is well-settled. The court should grant summary judgment only when the pleadings, responses to discovery and the record reveal that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a);  *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). A genuine dispute of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587. In order to be successful on a motion for summary judgment, a moving party "must show that there is an absence of evidence to support the non-moving party's case" or that "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore*, *Ky.,* 93 F.3d 230, 233 (6th Cir. 1996). When a motion for summary judgment is made and is properly supported by affidavits, depositions or answers to interrogatories, the nonmoving party may not rest on the mere allegations or denials of the pleadings.  *See Oliver v. Va. Dep't of Corrs.*, 2010 WL 1417833, at *2 (W.D. Va. Apr. 6, 2010) (citing FED. R. CIV. P. 56(e)). Instead, the nonmoving party must respond by affidavits or

otherwise and present specific facts from which a jury could reasonably find for either side. *See Anderson*, 477 U.S. at 256-57.

The Eighth Amendment to the U.S. Constitution not only prohibits excessive sentences, but it also protects inmates from inhumane treatment and conditions while imprisoned. *See Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). This includes a requirement that a state provide medical care to those it punishes by incarceration. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *Godfrey v. Russell*, 2015 WL 5657037, at *8 (W.D. Va. Sep. 24, 2015) (citing *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977)); *Chapman v. Rhodes*, 434 F. Supp. 1007, 1020 (S.D. Ohio 1977), *aff'd*, 624 F.2d 1099 (6th Cir. 1980), *rev'd on other grounds*, 452 U.S. 337, 344 (1981). For a prisoner to state a constitutional claim for denial of medical care, he must demonstrate that a defendant's acts or omissions amounted to deliberate indifference to his serious medical needs. *See Estelle*, 429 U.S. at 106. In essence, treatment rendered must be so grossly incompetent or inadequate as to shock the conscience or to be intolerable to fundamental fairness. *See Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citation omitted). To establish liability under § 1983, a plaintiff must prove that the defendants "acted personally in the deprivation of the plaintiff's rights." *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985). Therefore, it is insufficient to show that the prison system, generically, failed to provide adequate medical care to an inmate.

A prison official is deliberately indifferent if he knows of, but disregards, an inmate's serious medical need. *See Farmer v. Brennan*, 511 U.S. 825, 844-45 (1994). Therefore, liability under this standard requires two showings. First, the evidence must show that the prison official subjectively recognized a serious medical need. It is not sufficient that the official should have recognized it; the

official must actually have known of it. *See Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). A medical need serious enough to give rise to a constitutional claim involves a condition that places the inmate at a substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment perpetuates severe pain. *See Farmer*, 511 U.S. at 832-35; *Sosebee v. Murphy*, 797 F.2d 179, 182-83 (4th Cir. 1986); *Loe v. Armistead*, 582 F.2d 1291, 1296-97 (4th Cir. 1978); *Rush v. Vandevander*, 2008 WL 495651, at *1 (W.D. Va. Feb. 21, 2008). Second, the evidence must show that the prison official subjectively recognized that his actions were "inappropriate in light of that risk." *Rich*, 129 F.3d at 340 n.2. It is insufficient that the official should have recognized that his actions were insufficient. *See Brown v. Harris*, 240 F.3d 383, 390-91 (4th Cir. 2001). "[D]eliberate indifference entails something more than mere negligence, … [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. Questions of medical judgment are not subject to judicial review. *See Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975). A claim regarding a disagreement between an inmate and medical personnel over diagnosis or course of treatment and allegations of malpractice or negligence in treatment do not state cognizable constitutional claims under the Eighth Amendment. *See Miltier*, 896 F.2d at 851-52; *Wright*, 766 F.2d at 849; *Estelle*, 429 U.S. at 105-06. An inmate is not entitled to unqualified access to health care; the right to medical treatment is limited to that treatment which is medically necessary and not to "that which may be considered merely desirable." *Jasper v. Mullins*, 2007 WL 3339605, at *2 (W.D. Va. Nov. 8, 2007) (quoting *Bowring*, 551 F.2d at 47-48).

In this case, the defendants argue that there is no genuine dispute of material fact and that they are entitled to entry of summary judgment in their favor.

Defendant Phipps argues that she is entitled to summary judgment on three alternative grounds:

1.   Monetary damages cannot be awarded against her, insofar as Morris sued her in her official capacity;

2.   She is entitled to qualified immunity against any claim for damages in her individual capacity based on her exercise of a discretionary function; and

3.   As a registered nurse, she did not make decisions as to any offender's medical needs or appropriate course of treatment.

Defendants Dr. McDuffie and Dr. Smith argue that they are entitled to summary judgment because they provided adequate medical care to Morris, and they were not deliberately indifferent to a serious medical need. Dr. Smith also argues that Morris has failed to produce evidence that any serious injury was suffered.

Morris also has filed cross-motions for summary judgment against defendants Phipps and Dr. McDuffie.

Based on the evidence before the court, I find that there is no genuine dispute of material fact and that defendant Phipps is entitled to the entry of summary judgment in her favor on Morris's remaining claim. The only evidence before the court regarding defendant Phipps is that she responded to Morris's August 30, 2015, Informal Complaint. Morris has produced no evidence that Phipps had the authority to prescribe hormone treatment for Morris. To the contrary, Phipps has provided undisputed evidence that, as a nurse, she did not have the authority to prescribe any course of treatment for any Red Onion inmate, including Morris. Rather, as a nurse, Phipps stated that she could only administer

medications or injections prescribed by physicians and that no physician ever prescribed hormone treatment or injections for Morris. Thus, the undisputed evidence shows that Phipps did not act personally to deny hormone treatment for Morris. *See Wright*, 766 F.2d at 850. Therefore, summary judgment should be entered in her favor.

I also find that there is no genuine dispute of material fact and that the defendants Dr. Smith and Dr. McDuffie are entitled to summary judgment as a matter of law. As outlined above, to state a constitutional claim for denial of medical care, a prisoner must demonstrate that a defendant's acts or omissions amounted to deliberate indifference to his serious medical needs. *See Estelle*, 429 U.S. at 106. Also, allegations of a disagreement between an inmate and medical personnel over a diagnosis or course of treatment do not state cognizable constitutional claims under the Eighth Amendment. *See Miltier*, 896 F.2d at 851-52; *Wright*, 766 F.2d at 849; *Estelle*, 429 U.S. at 105-06.

The evidence before the court in this case -- even when viewed in the light most favorable to Morris -- at best shows a disagreement as to diagnosis and a proper course of treatment. Dr. Smith has stated that, as a medical doctor, he deferred to Mental Health with regard to a diagnosis of GID and that his review of Morris's Mental Health records showed no recommendation for hormone shots or treatment. The undisputed evidence before the court shows that Dr. Smith evaluated Morris on September 1, 2015, in light of a request by Morris for hormone shots. At that time, there was no diagnosis of Morris suffering from GID or gender dysphoria. There also was no recommendation that Morris receive treatment with hormones. According to Dr. Smith, he found Morris's condition to be stable and that Morris's condition continued to be monitored. Such evidence simply does not rise, or should I say, fall, to the level of grossly incompetent or

inadequate treatment required to prove a constitutional violation. *See Miltier*, 896 F.2d at 851.

The undisputed mental health evidence before the court shows that, while Red Onion's mental health professionals have continued to assess, evaluate and treat Morris, to date, none of them have recommended that Morris receive hormones as a treatment. Phipps has provided evidence that she has reviewed Morris's medical records and that no physician has ever ordered that Morris receive hormone shots. Dr. McDuffie has provided evidence that Morris's vague statements about GID on October 29, 2015, were inadequate for a diagnosis at that time. The evidence provided also shows that Morris underwent a thorough psychological evaluation on January 8, 2016, to determine whether Morris suffered from gender dysphoria. The results of that evaluation were inconclusive.

While the most recent mental health evidence before the court shows that Dr. McDuffie had diagnosed Morris with unspecified gender identity disorder as of August 2016, there is no evidence before the court that any mental health professional has recommended hormone treatment for Morris for this condition. The evidence before the court shows that, at most, Dr. McDuffie has recommended further evaluation with a more learned psychiatric consultant with regard to Morris's diagnosis and necessary treatment. That being the case, such evidence does not rise to the level of a constitutional violation.

## PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. There is no genuine dispute of material fact that Phipps did not deny hormone treatment for Morris, and summary judgment should be entered as a matter of law in Phipps's favor;
2. There is no genuine dispute of material fact that Dr. Smith was not deliberately indifferent to a serious medical need of Morris, and summary judgment should be entered as a matter of law in Dr. Smith's favor; and
3. There is no genuine dispute of material fact that Dr. McDuffie was not deliberately indifferent to a serious medical need of Morris, and summary judgment should be entered as a matter of law in Dr. McDuffie's favor.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court deny Morris's Motions for Summary Judgment, grant Phipps's Motion for Summary Judgment, grant Dr. Smith's Motion for Summary Judgment, grant Dr. McDuffie's Motion for Summary Judgment and enter judgment in the defendants' favor on Morris's remaining claim.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file written objection to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion

of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable Norman K. Moon, Senior United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record and unrepresented parties.

DATED: February 13, 2018.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE