IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| TERAH MORRIS, *Plaintiff*, v. STEPHANIE FLETCHER, *ET AL.*, *Defendants*. | CASE NO. 7:15-cv-00675<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

Plaintiff Terah Morris is an incarcerated transgender woman. She sued various prison officials because of their alleged delay in diagnosing and treating her gender identity disorder.[1] The matter is before the Court on cross-motions for summary judgment (dkts. 230, 232, 239, & 241), the Report and Recommendation of Magistrate Judge Pamela Sargent (dkt. 262, "R&R"), and Plaintiff's objections to the R&R (dkt. 264). The Court referred the matter to Judge Sargent for proposed factual findings and a recommended disposition. 28 U.S.C. § 636(b)(1)(B). Judge Sargent recommended that the Court deny Plaintiff's motion and grant Defendants' motions. Plaintiff filed three objections, and so the Court will review the objected portions of the R&R *de novo*.[2] The Court finds Plaintiffs' objections lack merit and will adopt Judge Sargent's R&R.

**I. LEGAL STANDARD**

A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is

---

[1] The Court will use female pronouns in accordance with Plaintiff's desire. (*See* dkt. 200).

[2] The Court previously entered an order adopting the R&R after no objections were filed within fourteen days of entry of the R&R. (Dkt. 263). However, the Court later reopened the case after receiving objections from Plaintiff. (*See* dkt. 266). Later the same day this Court entered that order, Plaintiff filed a notice of appeal arguing that this Court should consider her objections. (Dkt. 267). Plaintiff voluntarily dismissed that appeal after realizing the Court had agreed to consider her objections. (Dkts. 271, 272).

1

such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* A court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). If there are cross-motions for summary judgment, a court must "consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Defs. of Wildlife v. N. Carolina Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014).

When a court refers a matter to a magistrate judge, any objections to the magistrate judge's R&R must be reviewed *de novo*. *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982); *see also* 28 U.S.C.A. § 636(b)(1). In addressing the objections, "[t]he district court does not need to provide an elaborate or lengthy explanation, but it must provide a specific rationale that permits meaningful appellate review." *Cruz v. Marshall*, 673 F. App'x 296, 299 (4th Cir. 2016).

## II. ANALYSIS

The Court will incorporate Judge Sargent's statement of the relevant facts, addressing two objections to that statement (and one objection to a conclusion of law) below. By way of summary, Plaintiff lived and presented as a male until 2015. While she had suffered from various mental health maladies (including schizophrenia and psychosis) throughout her incarceration, Plaintiff first began telling prison medical staff that she was suffering from gender identity disorder in 2015. She had never been diagnosed with a gender identity disorder or been prescribed any treatment for such a disorder. Around this time, Plaintiff also began requesting hormone shot treatment from Defendants Smith and Phipps. Medical staff, including Defendants Smith and Phipps, referred her to Defendant McDuffie, a psychiatrist.

Defendant McDuffie was initially skeptical of Plaintiff's self-diagnosis due to a lack of recorded symptoms and Plaintiff's history of manipulating prison staff. In their first meeting about Plaintiff's alleged gender identity disorder, Plaintiff claims that McDuffie yelled at her and ended the meeting abruptly because he believed she was feigning the disorder. In the following months, however, it is undisputed that McDuffie continued meeting with Plaintiff and Plaintiff was given a thorough psychological evaluation. After these continued meetings, McDuffie equivocally diagnosed Plaintiff with an "unspecified" gender identity disorder in 2016, although he retained some concern that Plaintiff was attempting to manipulate him. McDuffie recommended that Plaintiff be referred to an expert for further diagnosis and treatment.[3] Plaintiff has continued to regularly meet with the medical and mental health staff concerning her gender identity disorder, but she has not received her desired hormone shot treatment. She has, however, received continuing treatment and medication for her other psychological issues.

Plaintiff alleges that the Defendants' failure to provide her with hormone shot treatment was cruel and unusual punishment that violates the Eighth Amendment. The Court finds no reasonable jury could find that the Defendants' continuing diagnostic treatment constituted deliberate indifference to Plaintiff's medical needs, and so the objections will be overruled.

**A. The Eighth Amendment and gender identity disorder**

"Prisoners alleging that they have been subjected to unconstitutional conditions of confinement must satisfy the Supreme Court's two-pronged test set forth in *Farmer v. Brennan*."

---

[3] The parties' evidence focuses on 2015 and 2016, with a few medical records from 2017. It does not mention the results of McDuffie's recommended referral. However, Plaintiff has filed a separate suit alleging similar claims against McDuffie. *See Morris v. Carey, et al.*, 7:17-cv-00093 (W.D.Va.). That suit contains further evidence of ongoing psychotherapy treatment and referrals that are the prerequisites to any further treatment for a gender identity disorder. Nevertheless, in this opinion, the Court restricts itself to the evidence submitted by the parties in this case.

*Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *see Farmer v. Brennan*, 511 U.S. 825, 832 (1994). First, "*Farmer*'s objective prong requires plaintiffs to demonstrate that 'the deprivation alleged [was], objectively, sufficiently serious.'" *Scinto*, 841 F.3d at 225. In order to be sufficiently serious, the deprivation must pose "a serious or significant physical or emotional injury resulting from the challenged conditions," or "a substantial risk of such serious harm resulting from . . . exposure to the challenged conditions." *De'lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003) (internal quotation marks and citation omitted). A medical need is sufficiently serious when it has either "been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). "Second, under *Farmer*'s 'subjective' prong, plaintiffs must show that prison officials acted with a 'sufficiently culpable state of mind.'" *Scinto*, 841 F.3d at 225. "[T]he requisite state of mind is deliberate indifference." *Id.* This means the officials knew of and disregarded an excessive risk to inmate health or safety. *Id.* Deliberate indifference requires "more than mere negligence." *Id.*

The Fourth Circuit has published two opinions concerning the interaction of the Eighth Amendment and gender identity disorder. *See De'lonta v. Angelone*, 330 F.3d 630 (4th Cir. 2003) ("*De'lonta I*"); *De'lonta v. Johnson*, 708 F.3d 520 (4th Cir. 2013) ("*De'lonta II*"). Both cases dealt with the same prisoner. The prisoner had been previously diagnosed with gender identity disorder and was receiving estrogen therapy. However, at some point prior to *De'lonta I*, the Virginia Department of Corrections ceased providing estrogen therapy to the prisoner. This caused the prisoner to suffer nausea, uncontrollable itching, and depression. Most harmfully, she also "developed an uncontrollable urge to mutilate her genitals." 330 F.3d at 632. Under *Farmer*'s objective prong, the Fourth Circuit held that the prisoner's "need for protection

4

against continued self-mutilation constitutes a serious medical need to which prison officials may not be deliberately indifferent." *Id.* at 634. The court found that the allegations of denial of care based on a uniform policy, "rather than on a medical judgment concerning [the prisoner's] specific circumstances," sufficiently made out *Farmer*'s subjective prong. *Id.* at 635.

Ten years later, the prisoner returned to the Fourth Circuit in *De'lonta II*. In the interim, the prisoner had received regular psychological counseling, hormone therapy, and been allowed to dress and live as a woman. 708 F.3d at 522. However, she still suffered the urge to self-mutilate, and requested sex reassignment surgery. *Id.* at 523. The Fourth Circuit again found that the prisoner's "need for protection against continued self-mutilation" constituted an objectively serious medical need. *Id.* at 525. The court also found *Farmer*'s subjective prong satisfied because the relevant standards of care indicated "that sex reassignment surgery may be necessary for individuals who continue to present with severe GID after one year of hormone therapy and dressing as a woman." *Id.* And so the court found that "just because [the Department of Corrections] ha[s] provided [the prisoner] with *some* treatment consistent with the GID Standards of Care, it does not follow that they have necessarily provided her with *constitutionally adequate* treatment." *Id.* at 526 (emphasis in the original). Accordingly, the court concluded that the prisoner adequately pled facts that satisfied the subjective prong. *Id.*

## B. The R&R and Plaintiff's objections

The R&R recommended the Court enter summary judgment in favor of all three remaining defendants. (Dkt. 262). Judge Sargent found that Defendant Phipps, as a nurse, was unable to prescribe a course of treatment and therefore did not personally deny Plaintiff hormone shot treatment. (*Id.* at 29–30). Judge Sargent found Defendant Smith was not deliberately indifferent because he reasonably deferred to the mental health providers' diagnosis of Plaintiff.

5

(*Id.* at 30). Finally, Judge Sargent found Defendant McDuffie had responded reasonably to Plaintiff's medical needs and that Plaintiff's claims against him only amount to disagreements about the proper course of treatment. (*Id.* at 30–31).

Plaintiff raises three objections to the R&R. (Dkt. 264). Two objections are to statements made by Defendant McDuffie and quoted by Judge Sargent in her recitation of the facts. (*Id.* at 1–3). Plaintiff objects that these two statements are "unduly burdensome." (*Id.*). The Court will construe Plaintiff's objections as objections to Judge Sargent's reliance on these statements in coming to her final conclusion that McDuffie was not deliberately indifferent. *C.f. De'lonta II*, 708 F.3d at 524 ("[W]e afford liberal construction to the allegations in pro se complaints raising civil rights issues."). Plaintiff's third objection concerns whether Defendant Phipps, a nurse, can be held liable for the denial of hormone shot treatment. Plaintiff does not object to Judge Sargent's recommendation that Defendant Smith is entitled to summary judgment.

1. **Whether there were indications Plaintiff intended to harm herself because of her alleged gender identity disorder prior to her self-diagnosis**

Defendant McDuffie testified, in his affidavit, that there were no indications Plaintiff intended to harm herself because of her gender identity disorder prior to her self-diagnosis on October 29, 2015. (Dkt. 233–4 at 2). Judge Sargent recounted this statement in her R&R. (Dkt. 262 at 4). Plaintiff attempts to dispute this statement by pointing to statements she made to a different mental health professional on November 23, 2015. (Dkt. 264 at 2 (citing dkt. 233–1 at ECF 26)). But these statements were made *after* the October 29, 2015 appointment where Plaintiff made her self-diagnosis to McDuffie, and so do not contradict Defendant McDuffie's statement Plaintiff had not displayed suicidal indications *before* that date. After reviewing the record, the Court notes that any other evidence of self-harm before the date of the appointment

(*i.e.,* the threatened hunger strike) was tied to Plaintiff's desire to be removed from disciplinary segregation and there is no evidence (or even argument) relating this conduct to her gender identity disorder. (*See* dkt. 233-1 at ECF 11). Plaintiff has not demonstrated that there is a genuine dispute Defendant McDuffie was aware of a serious medical need before Plaintiff's self-diagnosis on October 29, 2015. His conduct before that point cannot give rise to a deliberate indifference claim. This objection will be overruled.

## 2. Whether Defendant McDuffie knowingly disregarded a serious medical need after Plaintiff's self-diagnosis

Construed liberally, Plaintiff also objects to Judge Sargent's finding that Defendant McDuffie was not deliberately indifferent to any serious medical need in the time following Plaintiff's self-diagnosis.[4] Plaintiff focuses on her first meeting with McDuffie where, crediting Plaintiff's testimony, McDuffie did not believe Plaintiff's self-diagnosis, claimed she was feigning the disorder, raised his voice, told her not to talk to him about gender identity disorder again, and abruptly ended the meeting. (Dkt. 239-1 at ECF 5). Plaintiff's pleadings and briefing also more generally allege that her Eighth Amendment rights were violated by McDuffie's ongoing failure to provide her with the hormone shot treatment she desires. (*Id.* at ECF 9; dkt. 264 at ECF 2–3).

Proceeding under *Farmer*'s two-prong framework, the Court will assume Plaintiff can "demonstrate that 'the deprivation alleged [was], objectively, sufficiently serious.'" *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016). The fundamental question then becomes whether Defendant McDuffie knew of and disregarded a serious risk of Plaintiff's self-harm. *De'lonta II*,

---

[4] Plaintiff objects to McDuffie's statement, recounted by Judge Sargent, that "[a]t no time was [McDuffie] deliberately indifferent to Plaintiff's medical needs, nor did [he] fail to provide care that [he] knew Plaintiff needed." (Dkt. 262 at 4–5). The Court construes Plaintiff's objections as objections to Judge Sargent's conclusion that McDuffie is entitled to summary judgment.

708 F.3d at 525. However, it is still helpful to start with a brief description of the nature of Plaintiff's medical need in order to determine whether McDuffie's response to that need constituted "constitutionally adequate treatment." *De'lonta II*, 708 F.3d at 526.

As in *De'lonta I* and *II*, the Court focuses on the prisoner's need for protection against self-harm and self-mutilation. *De'Lonta I*, 330 F.3d at 634; *De'Lonta II*, 70 F.3d at 525. Before her self-diagnosis, Plaintiff had repeatedly threatened self-harm, but her threats were connected to attempts to manipulate prison staff and unrelated to gender identity disorder. (*See, e.g.,* dkt. 233-1 at ECF 2 ("They put me down here for something stupid, so I am not going to eat or take my medications."); *id.* at ECF 11 (threatening to hurt herself unless she was allowed to move back in with her "cellie")); *id.* at ECF 12 (reporting that she had "audio hallucinations that told [her] to hurt [herself]" when she was placed in disciplinary segregation); *id.* at ECF 16 (threatening that she "will become suicidal again if [she] does not get what [she] wants; [she] wants a cell partner because [she] says [she] hears voices when [she] is lonely.").

After her self-diagnosis, there were three threats of self-harm that a jury could find relate to Plaintiff's gender identity disorder. First, Plaintiff sent a letter stating she was "really on the verge of suicide." (Dkt. 233-1 at ECF 26–27). The letter was intercepted by prison staff and referred to the mental health staff. (*Id.*). They immediately checked in with Plaintiff, who denied she was suicidal or had thoughts of self-harm and instead told them the letter was part of her efforts to get support from outside the prison in her effort to fully present as a woman. (*Id.*). Plaintiff was monitored and then released from mental health precautions. (*Id.* at ECF 28). Second, Plaintiff underwent a robust mental health evaluation to determine whether she suffered from a gender identity disorder or gender dysphoria. (*Id.* at ECF 31–34). In the process of that assessment, she self-reported that she "had been having thoughts of 'cutting [her] male organs

8

off in the last 4 or 5 months.'" (*Id.* at ECF 33). The report went on to note that there "had been no instances of self-harm or self-mutilation concerning [Plaintiff] reported." (*Id.*). Third and finally, after a mental health professional refused to immediately take her from her cell for an unscheduled appointment, she threatened that "if you don't do what I say I am going to bang and scream all day to drive you crazy . . . . I will also be going on a hunger strike as well." (*Id.* at ECF 51). Plaintiff later had an appointment with the mental health staff, and there is no evidence she followed through on her threat of a hunger strike. (*Id.*).

While the threats of self-harm and self-mutilation are serious, Plaintiff's situation is quite different from that at issue in *De'lonta I* and *De'lonta II*. In those cases, the prisoner's "uncontrollable urge to mutilate her genitals" had developed as an effect of the Department of Correction's cessation of her hormone treatment. 330 F.3d at 632. The prisoner had "stabbed or cut her genitals on more than 20 occasions." *Id.* Here, alternatively, there was no history of diagnosis and treatment of gender identity disorder that was abruptly terminated. Plaintiff admits she did not know anything about hormonal treatment or sex reassignment surgery until a fellow inmate told her about the treatment in 2011. (Dkt. 208 at ECF 1). While she alleges she obtained hormones illegally after that point, she admits she never was diagnosed with gender identity disorder. (*Id.*). More fundamentally, however, Plaintiff told the mental health staff she "did not have any difficulties and had been off hormones before entering [the Department of Corrections] and no current concerns and no[] reactions since being off the medication." (Dkt. 233-1 at ECF 22). Finally, while Plaintiff has repeatedly threatened different types of self-harm, she does not have the demonstrated history of self-harm present in *De'lonta*.

With this understanding of Plaintiff's medical need, the Court finds no reasonable jury could find that the Defendants' continuing diagnostic treatment constituted deliberate

indifference. This is for two primary reasons. First, Defendant McDuffie's ongoing caution before affirmatively diagnosing Plaintiff with a gender identity disorder is reasonable in light of Plaintiff's medical history and pattern of deception. Unlike the plaintiff in *De'lonta*, Plaintiff had not previously been diagnosed with or treated for gender identity disorder. Instead, she was "one of a population of incarcerated individuals claiming to have a gender identity dysphoria without matching the etiology and natural history that would typically be seen among GID individuals . . . ." (Dkt. 233-1 at ECF 53). As noted above, Plaintiff had also repeatedly attempted to manipulate the medical and mental health staff into receiving medication and treatment, some of which she would "hoard" and then "pass" to other inmates. (*Id.* at ECF 30). Plaintiff had also attempted to use feigned illnesses to avoid punishment for disciplinary issues, including her designation as a high risk sexual aggressor. (*Id.* at ECF 4–5).

Defendant McDuffie's continuing concern that Plaintiff was feigning illness was at least partially due to Plaintiff's ongoing behavior after the self-diagnosis. As summarized above, Plaintiff continued to display manipulative behavior. (Dkt. 233-1 at ECF 51) ("[I]f you don't do what I say I am going to bang and scream all day to drive you crazy . . . . I will also be going on a hunger strike as well."). Another mental health professional warned his colleagues to "not allow [Plaintiff]'s attempts at manipulating any success as it will only reinforce this mal-adaptive behavior." (Dkt. 233-1 at ECF 52). She also had a history of erroneous self-diagnosis. After reviewing a medical book, Plaintiff diagnosed herself with scoliosis. (*Id.* at ECF 42). This self-diagnosis turned out to be unfounded. (*Id.*). This experience understandably influenced Defendants' overall response to this self-diagnosis. Here, Plaintiff also "held up a book and displayed it to [a mental health professional] and stated 'This book is about being transgender and I have a whole bunch of symptoms I need to share with you regarding what I have read in

10

this book.'" (*Id.* at ECF 48). In light of her history, Defendant McDuffie's original reluctance to immediately credit Plaintiff's self-diagnosis was eminently reasonable. *See Smith v. Hayman*, 489 F. App'x 544, 547 (3d Cir. 2012) ("While in certain circumstances the failure to provide hormones and other courses of treatment can be constitutionally impermissible, the allegations of the present case do not show ignorance or an affirmative failure to treat, but rather caution and diagnostic disagreement. Such circumstances, in the absence of aggravating factors such as previous GID treatment or even a definitive GID diagnosis, do not rise to the level of constitutional violation.").

Second, Defendant McDuffie's ongoing evaluation and treatment of the whole range of Plaintiff's medical and mental health problems has been a constitutionally adequate response to Plaintiff's medical needs. Plaintiff's disagreements with this medical judgment do not amount to an Eighth Amendment violation. *See De'lonta I*, 330 F.3d at 635 (citing *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975), for the proposition that "[q]uestions of medical judgment are not subject to judicial review" under § 1983).

Despite Defendant McDuffie's initial reluctance to credit Plaintiff's self-diagnosis, McDuffie scheduled a follow-up appointment with Plaintiff. Plaintiff then was given an extensive psychological evaluation for gender identity disorder in January 2016. (Dkt. 233-1 at ECF 31–34). The results of that evaluation were "inconclusive." (*Id.* at ECF 34). McDuffie and Plaintiff continued to meet throughout the following year until McDuffie issued the equivocal diagnosis that Plaintiff suffered from an "unspecified" gender identity disorder. (*Id.* at ECF 54). McDuffie asked the Virginia Department of Corrections for a second opinion on Plaintiff's diagnosis due to his ongoing doubts about the appropriate diagnosis and course of care. (*Id.* at ECF 58 (expressing doubts about diagnosis because "the offender does not always offer truthful

11

portrayals of reality in recalling [her] own experiences")). McDuffie and other mental health providers have continued to see Plaintiff "on a monthly, or more often, basis to assess for any indications of depression, anxiety or psychosis that would indicate the need for further treatment." (*Id.* at ECF 56). Throughout this time Plaintiff was prescribed various medications for her borderline personality disorder and anxiety. (*Id.* at 30, 59).

The undisputed evidence demonstrates an individualized and ongoing assessment of Plaintiff's medical and mental health needs. This is quite different from the denial of requested treatment in *De'lonta*, where the plaintiff's desired treatment was denied as part of a blanket Department of Corrections policy. *See De'lonta I*, 330 F.3d at 635 ("Dr. Smith's response to the memo, which states that there was no gender specialist at MCV and that VDOC's policy is not to provide hormone therapy to prisoners, supports the inference that Appellees' refusal to provide hormone treatment to [the prisoner] was based solely on the Policy rather than on a medical judgment concerning [the prisoner]'s specific circumstances."). Instead, McDuffie and the other mental health professionals have continued to work towards the proper diagnosis and treatment plan. While this process has been more cautious than Plaintiff would like, "disagreements between an inmate and a physician over the inmate's proper medical care are not actionable absent exceptional circumstances." *Scinto*, 841 F.3d at 225–26. Defendant McDuffie has not exhibited deliberate indifference in response to Plaintiff's medical and mental health needs. This objection will be overruled.

### 3. Whether Defendant Phipps personally denied hormone treatment to Plaintiff

Plaintiff's third objection is to Judge Sargent's finding that Defendant Phipps was entitled to summary judgment because she was not personally involved in the decision to deny hormone treatment. (Dkt. 264 at 3–4). When Plaintiff requested hormone shot treatment, Defendant

12

Phipps responded that she would not be able to provide hormone shot treatment because it had not been prescribed by the mental health staff and noted that Plaintiff had male genitalia. (Dkt. 239-7 at ECF 2). While Defendant Phipps' comments about Plaintiff's genitalia were perhaps insensitive to Plaintiff's allegations of gender identity disorder, this comment did not itself give rise to an Eighth Amendment violation because it did not create "a serious or significant physical or emotional injury resulting from the challenged conditions." *De'lonta I*, 330 F.3d at 634. Defendant Phipps's response to Plaintiff's underlying desire to receive hormone shot treatment also does not give rise to an Eighth Amendment violation. While Defendant Phipps was personally unable to change Plaintiff's treatment, the request for diagnosis and treatment was referred to those doctors and mental health professionals who were authorized to make diagnoses and changes to Plaintiff's treatment plan (namely Defendant McDuffie). Plaintiff's disagreement with those medical professionals' judgment does not, on this record, establish deliberate indifference on the part of Defendant Phipps. This objection will be overruled.

\* \* \*

The Court will enter an order overruling each of Plaintiff's objections (dkt. 264), adopting the Magistrate Judge's R&R in full (dkt. 262), granting the Defendants' motion for summary judgment (dkts. 230, 232, & 241), denying Plaintiff's motion (dkt. 239), and dismissing and striking this action from the active docket of the Court. The Clerk of the Court is hereby directed to send a certified copy of this Memorandum Opinion and the accompanying Order to all counsel of record, and to Judge Pamela Sargent.

Entered this __2nd__ day of May, 2018.

*[signature: Norman K. Moon]*
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE